**In re RIVERSIDEWORLD, INC., Debtor.**

**Larry S. Eide, trustee Plaintiff**

**v.**

**National City Capital Corp.; Great Lakes Capital Investments, LLC; Halle Fine Terrion, trustee Defendants.**

**Bankruptcy No. 05–01841M.**
**Adversary No. 05–9123M.**

United States Bankruptcy Court, N.D. Iowa.

April 3, 2007.

Jeffrey D. Goetz, Bradshaw, Flowler, Proctor & Fairgrave, Patrick D. Smith, Des Moines, IA, for trustee Plaintiff.

Larry S. Eide, Mason City, IA, trustee Plaintiff.

Brad C. Epperly, Nyemaster, Goode, et al., Des Moines, IA, for Defendants.

## DECISION

WILLIAM L. EDMONDS, Chief Bankruptcy Judge.

In this proceeding, Larry S. Eide, trustee, seeks to avoid the debtor's transfer to defendants of a deed of trust to real property located in Hardin County, Iowa. Trial was held December 6, 2006 in Fort Dodge. Patrick D. Smith appeared as attorney for Eide. Brad C. Epperly appeared as attorney for defendants National City Capital Corporation (National City) and Great Lakes Capital Investments III, LLC (Great Lakes). Terrion, as trustee, holds the deed of trust for the benefit of National City and Great Lakes. This is a core proceeding under 28 U.S.C. § 157(b)(2)(H).

On April 22, 2005, three creditors of RiversideWorld, Inc.[1] filed an involuntary petition against it under chapter 7 of the Bankruptcy Code (11 U.S.C. § 303). The court issued its order for relief on May 13, 2005 (case doc. 15). Eide was appointed trustee.

Eide's complaint to avoid the transfer to defendants was based on several theories. Defendants moved for summary judgment, and, on June 27, 2006, the court granted partial summary adjudication in favor of defendants on all theories but one. The remaining claim is that the transfer was fraudulent under Iowa's fraudulent transfers statute (Iowa Code, Chapter 684),

which the trustee employs pursuant to his powers under 11 U.S.C. § 544(b).

### Findings of Fact

RiversideWorld, Inc., the debtor, and its parent company, RiversideWorld Holdings, Inc., were established in early 2001 to purchase the assets of Riverside Book & Bible, Inc. and its subsidiary, World Bible, Inc. Riverside Book & Bible distributed Christian products, and World Bible published Christian books. Both companies were located in Iowa Falls, Iowa. Riverside Book & Bible was owned at the time by Jordan Industries, Inc. Jordan had been trying to sell the companies or their assets but it had not found a buyer. Jordan's president suggested a management-led buyout to Seaman A. ("Skip") Knapp, president of Riverside Book & Bible.

Knapp engaged the firm of McFarland Grossman from Houston to put together a presentation to locate investors and lenders and to consummate a purchase. McFarland Grossman made a presentation to Huron Capital Partners, LLC, (hereafter "Huron Capital"), a private entity investment firm located in Michigan. It expressed interest in the investment, and it retained Internet Telebusiness & Marketing Services, Inc. (ITMS) to perform a due diligence investigation of the seller. Tim Williams and Rob Murphy were officers of ITMS. Murphy was contacted by an acquaintance, Michael Beauregard, a partner in Huron Capital. Murphy called on Richard Pigott for help with the investigation. Pigott had had experience in the Christian products distribution business. Pigott had previously been an officer with Spring Arbor Distribution Company, a Christian products distributor located in Michigan.

---

1. The spelling of debtor's name is not consistent in the pleadings, briefs or exhibits. The court will use this style.

Knapp had also previously worked for Spring Arbor.

Huron Capital agreed to invest in the buyout. It used Huron Fund, LP, an investment fund in which it was a general partner, to purchase 87 per cent of the common stock of a newly formed corporation, RiversideWorld Holdings, Inc. (hereafter "HOLDINGS"). The remaining 13 per cent of the stock was purchased by some of the management employees of seller and perhaps by others. Knapp was one of the employee-investors. Pigott also invested. It is unclear whether ITMS acquired shares in HOLDINGS. The Creditor Information Package and Liquidation Plan approved by debtor states that it did (exhibit 28, p. 3, section B). Tim Williams, an ITMS officer, testified that it did not own stock in HOLDINGS. Knapp testified that it did.

HOLDINGS was formed to own all of the common stock in RiversideWorld, Inc. which was established at the same time to be the operating company for the book publishing and Christian products distribution businesses.

Huron Capital was the general partner in Huron Fund, LP. An entity named National City Equity Partners was a limited partner in the Huron Fund, LP. It had made a 12 million dollar investment commitment to the fund in 1999. It was a limited partner to the extent of 17 per cent of Huron Fund, LP.

National City Equity Partners was owned entirely by National City Corporation, a publicly traded company. Also, National City Corporation owned National City Bank and 100 per cent of National City Capital Corp., a defendant in this proceeding.

Great Lakes Capital Investments III, LLC is an investment vehicle that in 2001 invested in tandem with National City Equity Partners or National City Capital Corp. Jay Freund, a member of Great Lakes and a general partner of National City and of National City Equity Partners, described Great Lakes as a "compensation perk" for individuals in the "National City group." They could invest in businesses through Great Lakes.

The funding for the establishment of HOLDINGS and RiversideWorld, Inc. and the purchase of its assets came from three sources.

> Equity capital was contributed by the Huron Fund, LP (approximately $3.3 million) and management investors (approximately $500,000); Mezzanine capital was provided by National City Capital Corporation ($1,912,500) and Great Lakes Capital Investments III, LLC ($337,500), pursuant to a Senior Subordinated Note and Warrant Purchase Agreement; the balance of the purchase price was borrowed from the senior secured lenders represented by Heller Financial (approximately $12 million).

Stipulated Facts, Stipulated Final Pre-trial Order (hereafter "Stipulation") (doc. 52), B–1–h.

> At the time of the asset purchase, the senior debt borrowed from Heller Financial was secured by substantially all the assets of Riverside World, Inc. The mezzanine capital provided pursuant to the Senior Subordinated Note and Warrant Purchase Agreement was unsecured at the time it was issued, but was subject to the terms and conditions of the Warrant Purchase Agreement.

Stipulation, B–1–i.

On February 2, 2001, RiversideWorld, Inc. executed and delivered to National City a "Senior Subordinated Promissory Note" for its $1,912,500 loan. On the same date, it executed and delivered to Great Lakes a "Senior Subordinated Promissory Note" for its loan of $337,500. The Senior

Subordinated Note and Warrant Purchase Agreement (hereafter "Agreement") was executed by RiversideWorld, Inc. as "Company" and by HOLDINGS as "Parent." Under the agreement, RiversideWorld, Inc. executed the notes, and HOLDINGS issued warrants to National City and Great Lakes for the purchase of shares of common stock in HOLDINGS. The shares subject to the warrants, if purchased, would represent 15 per cent of the "fully-diluted Class A Common Stock" of HOLDINGS (exhibit 1, p. 1). At no time were the warrants used to purchase stock.

The agreement also permitted Great Lakes and National City to receive notice of meetings and of actions by the Board of HOLDINGS (exhibit 1, section 8.02). At all times relevant to the dispute, the Agreement also gave National City and Great Lakes the right to send one representative to meetings of the Board of Directors of HOLDINGS (exhibit 1, section 8.02). The representative selected by National City and Great Lakes, the mezzanine lenders, was Jay Freund.

Jay Freund represented the interests of National City Capital Corporation and Great Lakes Investments III, LLC, in all matters relating to [HOLDINGS] and Riverside World, Inc. At all times relevant to this action, Mr. Freund was an employee of National City Equity Partners, Inc., with the title of "Director." Mr. Freund's title with National City Capital Corporation was also "Director." [fn. 1] Mr. Freund was a "Member" of Great Lakes Capital Investments III, LLC.

[Footnote 1] At no time relevant to this action was Jay Freund a member of the Board of Directors of either National City Equity Partners, Inc. or National City Capital Corporation. In addition, it should be noted that at the present time, Mr. Freund's title with both National City Equity Partners, Inc. and National City Capital Corporation is "General Partner."

Stipulation, B–1–m.

Pursuant to the Warrant Purchase Agreement, Jay Freund attended the following Board Meetings of [HOLDINGS] as the designated representative of National City Capital Corporation and Great Lakes Capital Investments III, LLC: February 2, 2002, April 26, 2002, August 19, 2002 and October 25, 2002.

Stipulation, B–1–o.

Initially, the Boards of HOLDINGS and RiversideWorld, Inc. each comprised three members. Huron Capital Partners had the right to elect two members of each board, and the management investors had the right to elect one member of each. Huron Capital Partners could add a member to each board, and if it did so, management investors could appoint an additional member to each.

Initially, each board was composed of Brian Demkowicz and Michael Beauregard, elected by Huron Capital Partners, and Skip Knapp, elected by the management investors. In the fall of 2001, Pigott was added to the boards by Huron Capital Partners. By no later than April 15, 2004, Scott O'Brien was added to the boards.

Michael Beauregard is an employee of Huron Capital Partners, with the title of "Partner." Brian Demkowicz is an employee of Huron Capital Partners, with the title of "Managing Partner."

Stipulation, B–1–p.

In February 2003, Seaman "Skip" Knapp ceased to be an officer of [HOLDINGS] and RiversideWorld, Inc. [He] did not attend a board meeting of [HOLDINGS] or RiversideWorld, Inc. after January 23, 2003.

Stipulation, B–1–u, v.

Knapp offered his resignation on February 3, 2003, because he believed that his

authority and responsibility had been significantly reduced. He was negotiating final compensation under his employment contract when Huron Capital Partners issued a notice of termination for cause. Knapp sued for compensation, and sometime later the parties agreed on the entry of judgment in Knapp's favor. There is no evidence he was ever removed from his position as director on the boards of HOLDINGS or RiversideWorld, Inc.

In addition to the formal boards, there existed what some of the witnesses called the "advisory board." Others called it a "working group." Knapp testified that in early 2001, at the beginning of a board meeting, Demkowicz declared that he was setting aside the scheduled meeting, and that an expanded group would meet as an advisory board. It was an attempt to bring additional expertise to the discussions. Thereafter, board meetings were changed to advisory board meetings by Demkowicz or Beauregard, often at the last moment. Members of the advisory board included formal board members and others that had been invited to the meeting. According to Knapp, the advisory board included him, Beauregard, Demkowicz, Pigott, Freund, Tim Williams, and Rob Murphy. Tim Williams testified that there were no official members of the Advisory Board. However, this was contradicted by a memo from Pigott to "Advisory Board Members" dated April 23, 2002 (exhibit 36). It memorialized the "Manager–Owners' designation of Skip Knapp as Advisory Board member for 2002." Advisory Board members had access to corporate financial information. There is no evidence they participated in formal voting with official board members on corporate resolutions or other official matters.

Under the Agreement, HOLDINGS and RiversideWorld, Inc. were obligated to provide National City and Great Lakes with audited annual financial statements, unaudited monthly financial statements, detailed management reports, and financial projection reports (exhibit 1, section 8.01(a), (b), and (e)).

The Agreement restricted RiversideWorld, Inc. from disposing of all or any substantial part of its business or assets until payment of all principal and interest on the notes (exhibit 1, sections 9.06(a) and 9.09). The promissory notes were subject to a "Subordination and Intercreditor Agreement" among National City, Great Lakes, Heller Financial, Inc., as agent for the senior lenders, RiversideWorld, Inc., and HOLDINGS (exhibit 1(c)). The claims of National City and Great Lakes were subordinated to the claims of senior lenders, and RiversideWorld, Inc. agreed that it would not make, and Great Lakes and National City agreed they would not accept, certain distributions or transfers, including security interests, until senior debt had been paid in full (exhibit 1(c), section 2.3). GE Capital appears to have been the major senior lender.

By the latter part of 2001, management at RiversideWorld, Inc. recognized a shift in the Christian products marketplace. It observed a marginalization of the industry's independent retailers which were the "lifeblood" of its business (exhibit 27, section IIA). It saw 2001 as a major financial disappointment (*id.*, section IIB). It blamed its performance in earnings on a weak economy, dwindling prospects for the independent Christian retailers it served, administrative turmoil, and the "cultural impact of 9/11" (*id.*).

In 2002, earnings were markedly down from 2001. Sales suffered throughout the year, and the company "ended the year breaking the most important covenants with the Secured Lenders" (*id.*). In late 2002, RiversideWorld, Inc. noted that its payables became "significantly stretched"

(*id.*). Approximately 26 per cent of its payable balances were beyond vendor terms (*id.*). The year 2003 proved even more difficult operationally (*id.*).

On November 6, 2002, RiversideWorld, Inc. entered into a waiver and amendment agreement regarding default on certain financial covenants with senior lenders (exhibit 61). The defaults concerned failure to comply with requirements as to the ratio of indebtedness to EBITDA (earnings before interest, depreciation and amortization) (*id.*). It was at least the second such default during that year (exhibit 60).

On December 1, 2002, Pigott sent a memo to the "Advisory Board of Directors" (exhibit 7). The memo discussed the risks to investment in the company. It pointed out the default on covenants with Heller's principal, GE Capital, and the likelihood of "unprecedented slowness in first quarter collections of accounts." Pigott discussed what he called the "dreadful" sales level in the products distribution business. He pointed out that "[o]ur payables situation as of 11–30–02 is sufficiently stretched to cause alarm" (*id.*, para. 10). Pigott wrote that he was "gravely concerned" and worried that creditors might throw the company into bankruptcy. If matters continued, it could lead to a forced liquidation in 2003. Pigott recounted that he had talked to Michael Beauregard, and was told that from the perspective of Huron Capital Partners, a forced liquidation during 2003 was "wholly unacceptable" (*id.*, p. 1 ¶ 2).

Pigott said that the company had to create a "liquidity event" to buy time and options. He brought up the options of selling the World Bible division or Riverside Distributions division. He opined that if World Bible could be sold for book value or the distribution division could be sold for $4 million over book value, it might be sufficient to safeguard invested capital.

In a later memo to Advisory Board Members regarding the January 27, 2003 Board Meeting, Pigott indicated that there had been or would be a presentation on the "increase in serious payables delinquency" (exhibit 42, para. 6).

On January 15, 2003, Foundation Publications, Inc. filed a civil action for breach of contract against RiversideWorld, Inc. In July 2003, during the litigation, Foundation took Pigott's deposition. The parties agreed on the record at the deposition that Pigott's responses concerning the possible full or partial liquidation of Riverside-World, Inc. would remain confidential.

RiversideWorld, Inc. found a buyer for the World Bible division. During July 2003, National City, Great Lakes, and RiversideWorld, Inc. began negotiations which led to the execution of Amendment No. 3 to the "Senior Subordinated Note and Warrant Purchase Agreement" (exhibit 12). The creditors consented to the sale of the World Bible division, and agreed to defer quarterly interest payments from July 1, 2003 (*id.*). RiversideWorld, Inc. and HOLDINGS agreed to grant National City and Great Lakes security interests in all of their assets (*id.* at pp. 2 and 4). There was sufficient consideration to support the granting of the security interest (Stipulation, B–1–e). The security interests included the Second Deed of Trust in the Hardin County property (exhibit 12A). The Deed was executed October 6, 2003 by Beauregard, and it was recorded on October 16, 2003 (*id.*). The trustee was Halle Fine Terrion. In March 2004, a partial release from the deed was executed and recorded to correct a legal description and to release a portion of the property.

Foundation obtained judgment against RiversideWorld, Inc. for $114,556.67 on

May 21, 2004. At the time of the involuntary petition, Foundation was an actual unsecured creditor of the debtor (Stipulation, B–1–f).

RiversideWorld, Inc. continued to negotiate with Heller/GE. Closing of the World Bible sale was planned for mid-September 2003. Beauregard sent an e-mail to Thomas Hjorth of GE on September 10, 2003 asking for limited lien release and waiver (exhibit 64). Beauregard told Hjorth that he saw "no reason to 'covenant' an APA [asset purchase agreement] or LOI [letter of intent] for the sale of the Riverside business by Dec 31 .... I cannot allow a 'forced sale' covenant to be in the document with a deadline for progress (LOI, etc.) to be any sooner than March 31, 2004" (*id.*).

On September 18, 2003, RiversideWorld, Inc. and Heller (for the senior secured lenders) executed an Eighth Amendment to Loan and Security Agreement (exhibit 53). The agreement amended section 4.27 of the parties' loan agreement to require the sale of the distribution business. RiversideWorld, Inc. was required to deliver to Heller by March 31, 2004 a letter of intent for the sale of substantially all assets of debtor's business. The amendment required payment in full to the senior lenders by May 31, 2004. I find that by no later than September 10, 2003, RiversideWorld, Inc. had determined to liquidate its assets.

At the time RiversideWorld, Inc. granted the Deed of Trust to Great Lakes and National City, its total liabilities exceeded its total assets at book value (exhibit 46). As of September 2003, the balance sheet showed $21,980,317 in assets at book value after depreciation. Without depreciation, book value of all assets was $22,113,678. Total liabilities were $25,866,281 (*id.*). However, Eide introduced no evidence as to the fair value of the assets at the time.

At the time RiversideWorld, Inc. granted the Deed of Trust to the defendants, its monthly earnings before interest, taxes, depreciation, and amortization had been a negative amount for three to four months. From May through the end of September, RiversideWorld, Inc. had total earnings (EBITDA) for the period of NEGATIVE $1,262,534. Rodney Brockett, RiversideWorld, Inc.'s assistant controller from 2001–2004, testified that RiversideWorld, Inc. was having difficulty paying its debts as they became due both before and after the sale of the World Bible division. He said that after the sale, the company was still in trouble and was paying the creditors who were the "squeaky wheels." I find and conclude that at the time RiversideWorld, Inc. granted the Deed of Trust to defendants, it was presumed to be insolvent in that it was generally not paying its debts as they became due. The presumption of insolvency has not been rebutted by the defendants.

I find that at the time the transfer of the Deed of Trust was made to Great Lakes and National City, they, through Freund had reasonable cause to believe that RiversideWorld, Inc. was insolvent. The evidence proves that Freund was informed throughout the lending relationship of the financial condition of RiversideWorld, Inc.

By January 2004, RiversideWorld, Inc. had signed a contract with NACM Great Lakes (National Association of Credit Management) for services on behalf of unsecured creditors in an out-of-court liquidation (exhibit 29). On January 19, 2004, at a board meeting, Pigott outlined the company's proposed liquidation plan, which the board then ratified. The board also approved the retention of outside liquidation legal counsel (exhibit 45).

On or about January 12, 2004, Pigott had notified unsecured creditors that Riv-

ersideWorld, Inc. was going out of business (exhibit 31). Included with his letter was an information package and liquidation plan with claim form (exhibit 27). This action was ratified by the board on January 19, 2004.

Throughout the liquidation process, RiversideWorld, Inc. made an effort to pay in full the debt to the senior secured lender. By June 15, 2004, it had done so (exhibit 47). The payoff placed National City and Great Lakes in first position as to the remaining assets including real estate. Throughout the remaining liquidation process, RiversideWorld, Inc. management made every effort to pay National City and Great Lakes.

> On or about September 20, 2004, the Nyemaster Goode Law Firm was retained by National City Capital Corporation and Great Lakes Capital Investments III, LLC to institute an action in State Court to foreclose the Security Interest.

Stipulation, B–1–r.

> The Nyemaster Good Law Firm represented Riversideworld, Inc. prior to the Involuntary Bankruptcy Petition being filed.

Stipulation, B–1–s.

On September 20, 2004, Great Lakes and National City filed their foreclosure petition against RiversideWorld, Inc. in the Iowa District Court for Hardin County. They claimed to be owed $2,077,917.67 in the aggregate and that the only remaining asset was the encumbered real property. After the filing of the involuntary petition, National City and Great Lakes obtained relief from the automatic stay to continue their foreclosure action. On December 2, 2005, the state court issued its judgment and decree granting judgment for $2,148,264.68 and foreclosing the Deed of Trust.

## Conclusions of Law

Trustee Eide may avoid any transfer of an interest of RiversideWorld, Inc. in property that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of the Bankruptcy Code (Title 11, United States Code).

Applicable law includes the statutes of Iowa. Section 684.5(2) states:

> A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

Eide may avoid the transfer to the extent necessary to satisfy the actual creditor's claim. Iowa Code § 684.7(1)(a).

A debtor, under Iowa's fraudulent transfer statute is presumed to be insolvent if it is "generally not paying [its] debts as they become due." Iowa Code § 684.2(2).

Based on my findings, I conclude:

Eide, as trustee, may employ 11 U.S.C. § 544(b) to avoid a transfer if it is voidable under Iowa Code § 684.5(2);

Foundation Publications, Inc., at the time of the transfer, held an unsecured claim that is allowable under 11 U.S.C. § 502.

If otherwise avoidable, Eide may avoid the transfer to the extent necessary to satisfy a claim in the approximate amount of $114,556.67, the amount of the claim of Foundation Publications, Inc.

The transfer of the security interests, including the Deed of Trust, to Great Lakes and National City were on account of antecedent debts.

RiversideWorld, Inc. was insolvent, within the meaning of Iowa Code

§ 684.2(2), at the time of the transfer of the security interests.

Great Lakes and National City had reasonable cause to believe that the debtor was insolvent at the time of the transfer of the security interests.

The remaining issue is whether either National City or Great Lakes is an insider of the debtor. The Iowa fraudulent transfer statute defines "insider" to include various entities depending on the nature of the debtor. Iowa Code § 684.1(7).

If the debtor is a corporation, insiders include all of the following:

(1) a director of the debtor

(2) an officer of the debtor

(3) person in control of the debtor

(4) a partnership in which debtor is a general partner

(5) a general partner in a partnership described in subparagraph (4).

Iowa Code § 684.1(7)(b)(1)-(5).

An "affiliate" includes, with certain exceptions not relevant in this case, "a person who directly or indirectly owns, controls, or holds with power to vote, twenty percent or more of the outstanding voting securities of the debtor...." Iowa Code § 684.1(1)(a). An "affiliate" also includes "a corporation twenty percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor or a person who directly or indirectly owns, controls, or holds with power to vote, twenty percent or more of the outstanding voting securities of the debtor...." Iowa Code § 684.1(1)(b).

Insider also includes "[a]n affiliate, or an insider of an affiliate as if the affiliate were the debtor." Iowa Code § 684.1(7)(d).

Insiders specifically defined by the statute are often called "statutory insiders." However, the term "insider" is not limited to those specifically described. The definitions of "insider" in the Iowa statute are similar, if not identical, to the definitions of "insider" in the Bankruptcy Code. *See* 11 U.S.C. § 101(31)(B). Cases interpreting the latter are therefore instructive.

An insider is said to be an entity with a sufficiently close relationship to the debtor that its conduct is made subject to closer scrutiny than those dealing at arm's length with debtor. *In re Controlled Power Corp. of Ohio*, 351 B.R. 470, 475 (Bankr. N.D.Ohio 2006). A creditor not dealing at arm's length with debtor, and whose special relationship with debtor enables it to compel payment of its claim, has sufficient control over debtor to be deemed an insider (*id.* at 475, citing *K & R Mining, Inc. v. Keffler Construction Co. (In re K & R Mining, Inc.)*, 103 B.R. 136 (Bankr. N.D.Ohio 1988)).

Huron Capital Partners and Huron Fund, LP are statutory insiders of HOLDINGS and RiversideWorld, Inc. Beauregard and Demkowicz are statutory insiders of HOLDINGS and RiversideWorld, Inc.

Freund is a statutory insider of Great Lakes, National City, and National City Equity Partners. National City Equity Partners is not a statutory insider of Huron Fund, LP. If Huron Fund, LP were the debtor, a general partner in Huron Fund, LP would be a statutory insider, but a limited partner would not. Iowa Code § 684.1(7)(c). If National City Equity Partners is not a statutory insider of Huron Fund, LP, then it is not a statutory insider of HOLDINGS or RiversideWorld, Inc.

I conclude that Jay Freund is not an insider of debtor. He did attend meetings of the boards of HOLDINGS and RiversideWorld, Inc., but he was directed by Great Lakes and National City to do so. Great Lakes and National City had con-

44

tracted for the right to be present in their loan agreements with HOLDINGS and RiversideWorld, Inc. There is no evidence that the loan agreement was anything other than an arm's length transaction. Also, there is no evidence that at board meetings Freund directed official board members or officers or that he voted on any matters. Also, I conclude that Freund was not an insider of RiversideWorld, Inc. by virtue of being part of the advisory board. There is no evidence that any advice, counsel or opinions of the advisory board were binding on the official boards.

■ The limited partnership of National City Equity Partners in Huron Fund, LP, an insider of HOLDINGS and RiversideWorld, Inc., and the close relationship of National City Equity Partners to National City, the secured creditor, certainly subject the transfer of the security interest to close scrutiny. National City Equity Partners is owned entirely by National City Corp. which also owned 100 per cent of National City. Thus, National City Equity Partners, a limited partner in Huron Fund, LP, was a "sister entity" to National City.

■ The question is whether the National City Equity Partners' 17 per cent limited partnership in Huron Fund, LP enabled it to compel RiversideWorld, Inc. to grant security interests to National City. I do not find it did, although it perhaps gave Huron Capital Partners and thus RiversideWorld, Inc. a reason to voluntarily prefer National City over other unsecured creditors.

I find that the reason National City was able to compel transfer of the security interests was its contractual right to prevent the sale of World Bible by RiversideWorld, Inc. Management of RiversideWorld, Inc. believed that if there was any hope in preserving any equity in the debtor, it would have to create a strategic

event to produce liquidity. Sale of World Bible was to be that hoped-for event. It is reasonable to infer that the sale was more important to RiversideWorld, Inc. than prevention of further encumbrances on its assets.

There is no evidence that National City's contractual right to prevent such sales was not obtained at arm's length at the outset of the loans. I find also there is no evidence that National City Equity Partners, by virtue of its limited partnership interest in Huron Fund, LP, controlled RiversideWorld, Inc. I find and conclude that National City was not an insider of RiversideWorld, Inc.

■ I find and conclude also that Great Lakes was not an insider of RiversideWorld, Inc. The only connection between National City Equity Partners and Great Lakes was Freund's membership in Great Lakes and his general partner status in National City Equity Partners. I find and conclude that Great Lakes' right to prevent the sale of World Bible was its leverage for obtaining the security interests.

Plaintiff's claim under 11 U.S.C. § 544(b) and Iowa Code § 684.5(2) will be dismissed. Also, I incorporate the findings and conclusions from my ruling on defendants' motion for summary judgment and will now enter judgment dismissing the trustee's other claims against defendants.

IT IS ORDERED that the claims of Larry S. Eide against National City Capital Corp., Great Lakes Capital Investments III, LLC, and Halle Fine Terrion are dismissed with prejudice. Judgment shall enter accordingly.